## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DANIEL A. HELEVA,** | : | **CIVIL ACTION NO. 1:05-CV-1139** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **SGT. JOSEPH KRAMER**, et al., | : | |
| | : | |
| **Defendants** | : | |

### <u>MEMORANDUM</u>

Plaintiff Daniel Heleva ("Heleva") commenced this civil rights action on

June 6, 2005.  (Doc. 1.)  Thereafter, he filed an amended complaint (Doc. 18) which,

on January 27, 2006, was dismissed for failure to state a claim upon which relief

may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).  (Doc. 27.)  A timely appeal

followed.  On January 29, 2007, the United States Court of Appeals affirmed in part,

reversed in part, and remanded the matter for further proceedings.  (Doc. 46.)  The

remand was based on the finding that Heleva stated a free exercise of religion claim

under the First Amendment.  (Doc. 46-2, at 5.)  Further, the Court of Appeals stated

that "[w]e express no opinion on whether Heleva states a RLUIPA [Religious Land

Use and Institutionalized Persons Act of 2000] claim, but, as his First Amendment

claim proceeds on remand, the District Court should evaluate it under RLUIPA as

well." (Doc. 46-2, at 4 n.2 (citation omitted).)  Presently before the court is

defendants' motion seeking summary judgment on Heleva's First Amendment and

RLUIPA claims.  (Doc. 66.)  For the reasons set forth below, the motion will be

granted.

I.    **Statement of Facts**

At all times relevant, Heleva was housed in a maximum security unit at the Monroe County Correctional Facility ("MCCF").  MCCF policy mandates that packages containing books shall be accepted only if sent directly from the publisher.  (Doc. 68-3, at 46.)  According to David Keenhold, who was the MCCF Warden at the time, "[i]f the origin of the publication is not the publisher, the books are not destroyed.  They are merely placed into the inmate's personal effects which are turned over to him upon release from our facility."  (Affidavit of David Keenhold ("Keenhold Affidavit," Doc. 68-3, at 2, ¶ 6.)  The policy was enacted to ensure that contraband was not smuggled into MCCF.  (Keenhold Affidavit, Doc. 68-3, at 2, ¶ 5.)  This policy has been reviewed each year by the Pennsylvania Department of Corrections and has been approved in its current form.  (Id. at ¶¶ 7, 8.)   Heleva does not dispute the policy or its purpose.  (Doc. 15, at 2, ¶¶ 18-20.)

On October 31, 2002, two books were delivered to the MCCF *via* UPS, as a gift to Heleva from his sister, and were received by Betty Roncone, a secretary at MCCF.  (Doc. 18, at 2; Doc. 77, at 3, 4.)  The first book was entitled "Survival Kit: 5 ways to Spiritual Growth," and the second was "The Power of a Praying Parent." (Doc. 18, at 2.)  When defendant Joseph Kramer ("Kramer"), a sergeant at MCCF, came into possession of the books, there was no wrapping on the books and they were not accompanied by an invoice from the publisher.  (Affidavit of Joseph Kramer ("Kramer Affidavit"), Doc. 68-2, at 2.)  Consequently, he did not give the books to Heleva.

Heleva filed a grievance on November 24, 2002.  (Doc. 20, at 6.)  It does not appear from the record that the grievance was pursued beyond initial review.  Thereafter, he filed numerous "requests" concerning the whereabouts of his books.  (Doc. 20, at 7-14, 16-18.)  Defendant Kramer advised him that the books were "oversized" and would be held with his personal belongings until they were pre-approved.  (Id. at 8.)  At some point, it became clear that the issue was the lack of invoices from the publisher, not the size of the books.  According to the record, his sister sent correspondence to defendant Deputy Warden Michael Tabery ("Tabery") in January 2003, enclosing copies of the invoices from the publisher.  (Id. at 2.)  Heleva still did not receive the books.  When Heleva inquired *via* an inmate request as to why he still was not able to obtain the books, Tabery advised him that defendant Deputy Warden Paul Jennings ("Jennings") was conducting an investigation into the matter.  (Id. at 11.)  His sister also forwarded correspondence, along with the publisher invoices, to the Chaplain on January 24, 2003.  (Id. at 7.)

On April 2, 2003, he filed a second grievance, "grieving the lack of response to his requests concerning the status of Mr. Jennings' investigation in the matter of the Religious books that were denied by Sgt. Kramer."  (Id. at 15.)  On May 30, 2003, he directed an appeal to defendant Keenhold.  (Id. at 18.)  Defendant Keenhold's investigation revealed that delivery of the books was temporarily delayed because the packaging materials and invoice that accompanied the books were separated and staff members were prevented from ascertaining their origin.  (Keenhold Affidavit, Doc. 68-3, at 2, ¶ 9.)  After the invoices were located and it was confirmed

that the books were sent by the publisher, defendant Keenhold directed his staff to give Heleva the books.  (Id. at ¶ 12.)  On June 16, 2003, Keenhold responded to the grievance as follows:

> This afternoon, I had contacted Sergeant Kramer to hear his experience on this matter and he informed me that from the time that Deputy Warden Jennings had replied to you at his level of the grievance procedure to the time that you moved the grievance up to my level your family had produced documentary evidence that the books did in fact come from the publisher.  He also informed me that he examined the books and had already given them to you on Friday, June 13, 2003.

(Id. at 19.)

Defendant Kramer states that when he learned that the books were sent from the publisher, he "immediately gave Heleva his books" and that he "did not in any way intend to deprive Heleva of his books."  (Kramer Affidavit, Doc. 68-2, at 3, ¶ 12.)  Defendant Keenhold also states that there was no intent to deprive Heleva of his books.  (Keenhold Affidavit, Doc. 68-3, at 3, ¶ 14.)  Further, MCCF staff "certainly did not intend to limit his exposure to his chosen religion or limit his ability to worship in accordance with his religion."  (Id.)  Rather, defendant Keenhold represents that the administration of MCCF respects all religions and encourages inmates to practice their religion and accommodates their needs by making religious services available, permits the wearing of religious medals, affords inmates the right to freedom of religious affiliation and voluntary religious worship, provides special religious needs diets, makes a chaplain available and grants access to religious materials and books through the chaplain.  (Id. at ¶¶ 15-16.)  In addition, there is an onsite branch of the Eastern Monroe Public Library which contains a

4

number of books with religious themes and also provides access to other branches of the Eastern Monroe Public Library System.  (Id. at ¶¶ 17-21; 49-62.)

Heleva denies that MCCF respects all religions and encourages inmates to practice their religions.  (Doc. 74, at 2, ¶ 26.)  He also denies that inmates' religious needs are accommodated.  (Id. at ¶ 27.)  He neither admits nor denies the statement that "[n]one of the defendants did anything to prevent Mr. Heleva from practicing whatever religion he claims to have adopted."  (Doc. 68, at 9, ¶ 28.)

## II.  **Standard of Review**

"Summary judgment serves as a minimal but important hurdle for litigants to overcome before presenting a claim to a jury."  Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 314 (M.D. Pa. 2004).  Faced with such a motion, the adverse party must produce affirmative evidence, beyond the disputed allegations of the pleadings, in support of the claim.  FED. R. CIV. P. 56(e); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Corneal v. Jackson Township, 313 F. Supp. 2d 457, 464 (M.D. Pa. 2003), aff'd, 94 Fed. Appx. 76 (3d Cir. 2004).  "Such affirmative evidence-- regardless of whether it is direct or circumstantial--must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance."  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001) (quoting Williams v. Borough of West Chester, 891 F.2d 458, 460-61 (3d Cir. 1989).  Only if this burden is met can the cause of action proceed.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Matsushita Elec. Indus. Co., Ltd.  v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see FED. R. CIV. P.  56(c), (e).

III.   **Discussion**

A.   Respondeat Superior

Defendants argue that they are entitled to an entry of summary judgment with respect to the claims lodged against Keenhold, Tabery, McFarland and Jennings because they are impermissibly based on a theory of *respondeat superior*. (Doc. 69, at 17.)  In order to make out a claim under Section 1983, a plaintiff must establish that each defendant had personal involvement in the alleged wrongs since liability cannot be predicated solely on the operation of *respondeat superior*.  Rizzo v. Goode, 423 U.S. 362 (1976);  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  Thus, individual liability can be imposed under Section 1983 only if the state actor played an "affirmative part" in the alleged misconduct.  Rode, *supra*. Personal involvement may be shown by either personal direction or actual knowledge and acquiescence in a subordinate's actions.  Id.  In summary, to maintain a claim for supervisory liability, Heleva "must show: 1) that the supervising official personally participated in the activity; 2) that the supervising official directed others to violate a person's rights; or 3) that the supervising official had knowledge of and acquiesced in a subordinate's violations."  Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293 (3d Cir. 1997); Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir.1995)).  Participation in the after-the-fact review of a grievance is not enough to establish personal involvement.  See Brooks v. Beard, 167 Fed. Appx. 923, 925 (3d Cir. 2006) (holding that a state prisoner's allegation that prison officials and administrators responded inappropriately, or failed to respond to a prison

6

grievance, did not establish that the officials and administrators were involved in the underlying allegedly unconstitutional conduct).

In answer to defendants' contention that plaintiff fails to state how the defendants, other than Sgt. Kramer, are involved in the violation of his civil rights . . ." (Doc. 66, at 2-3, ¶ 9), Heleva states that "[d]efendants held supervisory positions over Sgt. Kramer, were notified of the deprivation, could and should have corrected the situation, but CHOSE to allow Sgt. Kramer to continue - unchecked- by befuddlement of the grievance procedure." (Doc. 70, at 2, ¶ 9.) He further states that "respondeat superiors had knowledge of the deprivation and proof of origin yet allowed the deprivation to continue unchecked." (Doc. 74, p. 2, at ¶ 22.)

However, it is evident from the record that the source of these defendants' "knowledge of the deprivation" was their involvement in the inmate request and grievance procedure and not a result of any involvement in the underlying deprivation. For instance, in a January 31, 2003, "appeal" directed to defendant Tabery, Heleva inquired as to why the books were still being held, even after the publishers' invoices were received by the prison. (Doc. 20, at 11.) Defendant Tabery directed Heleva to a previous response from defendant Kramer and also informed him that the matter was forwarded to defendant Jennings for further investigation. (Id.) In response to subsequent requests, defendant Tabery advised him that he was unable to provide further information because defendant Jennings was on vacation, or referred Heleva to defendant Kramer's responses to his prior inquiries. (Id. at 12-14.) On April 2, 2003, Heleva filed a grievance concerning the

fact that defendant Jennings had not responded to his inquiries concerning the status of the investigation.  (Doc. 77, at 27.)  He also directed multiple inmate requests to defendant Jennings complaining that he was not kept advised of the status of the investigation and also indicating that he was appealing Jennings' decision to uphold defendant Kramer's refusal to deliver the religious books.  (Doc. 77, at 28-30, 32-33.)  At one point, he inquired of Jennings about the results of his appeal.  (Id. at 29.)  In response to that inquiry, defendant McFarland informed Heleva that it was necessary for him to file an appeal to the warden.  (Id.)  Heleva took issue with defendant McFarland's "interfering in the grievance procedure." (Id. at 31, 34-35.)  Lastly, according to the record, the one and only time that defendant Keenhold was made aware of the problem was *via* an appeal dated May 30, 2003, to which defendant Keenhold promptly responded.  (Id. at 36-37.)

It is clear from review of the record that the claims against these defendants are solely based on their role in the inmate request and grievance procedure and not based on any involvement in the underlying deprivation.  They are therefore entitled to an entry of summary judgment on the civil rights claim.

However, even if these defendants were found to be personally involved in the underlying conduct, they would still be entitled to an entry of summary judgment based on the following analysis.

B.    First Amendment Turner Analysis

Heleva claims that his First Amendment rights were violated when access to two religious publications was delayed due to the MCCF policy, which mandates

that packages containing books shall be accepted only if sent directly from the publisher.  To establish a free exercise violation, Heleva must show that the defendants burdened the practice of his religion by preventing him from engaging in conduct mandated by his faith without any justification reasonably related to legitimate penological interests.  See Turner v. Safley, 482 U.S. 78, 89 (1987).

The First Amendment offers protection for a wide variety of expressive activities.  See U.S. Const. amend I.  These rights are lessened, but not extinguished in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct.  See Turner, 482 U.S. at 89.  Prisoners must be afforded "reasonable opportunities" to exercise their religious freedom guaranteed by the First Amendment.  Cruz v. Beto, 405 U.S. 319, 322 n.2 (1972).  However, imprisonment necessarily results in restrictions on some constitutional rights, including the First Amendment's right to the free exercise of religion.  O'Lone v. Shabazz, 482 U.S. 342, 348-49 (1987).  It is well-established that only those religious beliefs which are (1) sincerely held, and (2) religious in nature are entitled to constitutional protection.  Wisconsin v. Yoder, 406 U.S. 205, 215-19 (1972); Dehart v. Horn, 227 F.3d 47, 51 (3d Cir. 2000); Africa v. Pennsylvania, 662 F.2d 1025, 1029-30 (3d Cir. 1981)(describing three indicia of religion (1) an attempt to address "fundamental and ultimate questions" involving "deep and imponderable matters"; (2) a comprehensive belief system; and (3) the presence of formal and external signs like clergy and observance of holidays.).

Once a plaintiff has demonstrated that a constitutionally protected interest is at stake, as is the case here, <u>Turner v. Safley</u> sets out a four-factor test to determine the reasonableness of the regulation.  <u>Turner</u>, 482 U.S. at 89-90.  The Turner test requires that:

> First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it, and this connection must not be so remote as to render the policy arbitrary or irrational. Second, a court must consider whether inmates retain alternative means of exercising the circumscribed right. Third, a court must take into account the costs that accommodating the right would impose on other inmates, guards, and prison resources generally. And fourth, a court must consider whether there are alternatives to the regulation that fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests.

<u>DeHart v. Horn</u>, 227 F.3d 47, 51 (3d Cir. 2000) (internal quotations and citation omitted).  Substantial deference must be given to prison administrators' judgment. <u>Overton v. Bazzetta</u>, 539 U.S. 126, 132 (2003).  While plaintiffs bear the overall burden of persuasion, <u>id.</u>, prison administrators are required to demonstrate a rational connection between the policy and the alleged interest, which "'must amount [ ] to more than a conclusory assertion.'"  <u>Jones v. Brown</u>, 461 F.3d 353, 360 (3d Cir. 2006) (quoting <u>Wolf v. Ashcroft</u>, 297 F.3d 305, 308 (3d Cir. 2002) (internal quotations omitted)).

Under the first <u>Turner</u> prong, which requires that there be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it, the court accords great deference to the judgments of prison officials "charged with the formidable task of running a prison."  <u>O'Lone</u>, 482

U.S. at 353.  Certain restrictions are justified by the valid penological objectives of

deterrence of crime, rehabilitation of prisoners, and institutional security.  <u>DeHart</u>,

227 F.3d at 50-51.

According to defendants, the purpose of the MCCF "publisher-only" policy is

to ensure that contraband is not smuggled into the facility in books.  Defendants

argue that prisons have reasonable concerns that contraband may be smuggled into

inmates from outside sources *via* books and publications and that adopting a

"publisher-only" rule provides some level of assurance.  (Doc. 69, at 12.)  Heleva

does not take issue with the regulation.  Defendants satisfy the first prong because

they had legitimate penological interests in preventing the smuggling of contraband

into the institution and the "publisher-only" policy is rationally related to that

interest.

The second <u>Turner</u> prong requires "a court to assess whether inmates retain

alternative means of exercising the circumscribed right. . . ."  <u>Fraise v. Terhune</u>, 283

F.3d 506, 518 (3d Cir. 2002).  Where "other avenues remain available for the

exercise of the inmate's religious faith, courts should be particularly conscious of

the measure of judicial deference owed to correction officials. . . ."  <u>DeHart</u>, 227 F.3d

at 59 (quoting <u>Turner</u>, 482 U.S. at 90) (internal quotations omitted).  As noted by

defendant Keenhold, the administration of MCCF encourages inmates to practice

their religion and accommodates their needs by making religious services available,

permits the wearing of religious medals, affords inmates the right to freedom of

religious affiliation and voluntary religious worship, provides special religious needs

11

diets, makes a chaplain available and grants access to religious materials and books through the chaplain and through the onsite public library.  While Heleva denies that inmates' religious needs are accommodated at MCCF, he does not come forth with any evidence of record to support his position.  He simply states that "Plaintiff here challenges Warden Keenholds [sic] character."  As stated above, when faced with a motion for summary judgment, the adverse party must produce affirmative evidence, beyond the disputed allegations of the pleadings, in support of the claim.  Heleva fails to meet his burden with respect to this prong.  In fact, he concedes that the prison chaplain offered him religious consult during the time at issue.  (Doc. 76, at 1, ¶ 4.)

"The third and fourth factors . . . focus on the specific religious practice or expression at issue and the consequences of accommodating the inmate for guards, for other inmates, and for the allocation of prison resources."  DeHart, 227 F.3d at 57.  Defendants argue that "it would be a substantial burden, not to mention security problem, to inspect the covers and each page of each publication shipped into the facility."  (Doc. 69, at 13.)  Heleva does not argue otherwise.

Based on the foregoing, the court concludes that MCCF's policy, which resulted in a delayed delivery of two religious publications, did not violate Heleva's First Amendment rights.  Accordingly, defendants are entitled to an entry of summary judgment on this claim.

C.     <u>RLUIPA Analysis</u>

Section 3 of RLUIPA provides, in relevant part, that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government establishes that the burden furthers "a compelling interest," and does so by the "least restrictive means."  42 U.S.C. § 2000cc-1(a)(1)-(2).  RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A); <u>see also</u> <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 715 (2005).

Although Congress intended that RLUIPA be construed "in favor of broad protection of religious exercise," <u>see</u> 42 U.S.C. § 2000cc-3(g), Congress also "anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'"  <u>Cutter</u>, 544 U.S. at 723.  Congress indicated that in the event an inmate's request for religious accommodation would "become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition."  <u>Id.</u> at 726.

Under RLUIPA, the plaintiff must show that his religious exercise has been burdened substantially by the challenged conduct.  <u>Washington v. Klem</u>, 497 F.3d 272, 277-78 (3d Cir. 2007).  The Third Circuit Court of Appeals has found that for the

13

purposes of RLUIPA, a substantial burden exists where: "1)a follower is forced to choose between following the precepts of his religion and forfeiting the benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs. Id. at 280. If the plaintiff shows that prison administrators' action or inaction has imposed a substantial burden on the exercise of the plaintiff's religion, the prison administrator must establish that the challenged conduct furthers a compelling governmental interest and that it is the least restrictive means of furthering that interest. Id. at 283.

Heleva alleges that defendants substantially burdened his exercise of religious practices by unnecessarily denying him access to two religious publications. While there is no question that there was an unfortunate delay of approximately eight months from the time the publications were received at the institution to the time they reached Heleva's hands, there simply is no evidence that because of this delay, Heleva was forced to choose between following the precepts of his religion and forfeiting the benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit. Nor was he substantially pressured to modify his behavior and violate his beliefs. Accordingly, defendants are entitled to an entry of summary judgment on the RLUIPA claim.

**IV.** **<u>Conclusion</u>**

Based on the foregoing, defendants' motion for summary judgment (Doc. 66)

will be granted.

An appropriate order will issue.


   <u>S/ Christopher C. Conner</u>
CHRISTOPHER C. CONNER
United States District Judge


Dated:     July 16, 2008

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DANIEL A. HELEVA,** | : | **CIVIL ACTION NO. 1:05-CV-1139** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **SGT. JOSEPH KRAMER, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## ORDER

AND NOW, this 16th day of July, 2008, for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that:

1.  Defendants' motion for summary judgment (Doc. 66) is GRANTED.

2.  The Clerk of Court is directed to ENTER judgment in favor of defendants and against plaintiff.

3.  The Clerk of Court is further directed to CLOSE this case.

4.  Any appeal from this order is DEEMED frivolous and not in good faith. See 28 U.S.C. § 1915(a)(3).


   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge